LE BLANC, Justice.
This case was previously before this court at which time the judgment of the lower court which had been in favor of plaintiff was reversed and the suit remanded to the lower court for a certain specific purpose. See Lakeside Dairies, Inc., v. Gregersen, 217 La. 510, 46 So.2d 752.
The suit is one for specific performance of a contract involving the sale and purchase of certain land and improvements located in Bridgedale Subdivision, Jefferson Parish, and designated as 5100 Airline Highway.
As will appear in the opinion on the original hearing the parties entered into a written contract of lease dated September 22, 1942 under the terms of which the lessee was given the privilege of purchasing the property leased at any time during the life of any extension or renewal thereof, for the price and sum of $11,100. The contract further provided that if the lessee should take advantage of the option, one hundred dollars out of the stipulated monthly rental of $150, was to be applied to the purchase price at the time of the transfer of title. The contract further provided that should the lessee exercise the option, lessors would have the privilege to purchase lots Nos. 7-16 inclusive which form the rear part of the property facing Rose Avenue, or any of them, for the price of $150 per lot within a period of six months from the time lessee would take title to *508 the whole of the property in the exercise of its option.
The principal and resolving contention presented on the first hearing was a plea of lesion beyond moiety. The plea had been rejected in the lower court but was sustained in this court and the case remanded to the district court -for the restricted purpose of permitting both parties litigant to introduce in evidence proof of the value of the property as of the month of July 1945, that being the time at which the defendant was placed in default and called upon to deliver title to the plaintiff.
Under Article 2590 of the Louisiana Statutes Annotated — Civil Code it is provided that in order “to ascertain whether there is a lesion beyond moiety, the immovable must be estimated according to the state in which it was, and the value which it had at the time of the sale.” The controversy arose over the fact that in this case there had not been a sale but merely a contract of sale and the query was whether the provisions of the cited article should be applied to such a contract. With one of the justices dissenting, the court held that the value of the immovable at the time of the sale governs in ascertaining whether there is lesion and that in a contract containing an option to purchase the value of the property is to. be determined not as of the date of the contract but as of the time of the exercise of the option. It was found that the exercise of the option in this case occurred in July, 1945 and that is -why the case, was remanded to the district court for the purpose of determining the value as of that time.[1]
The District Judge heard considerable testimony relating to the value of the property and the improvements thereon as of July, 1945. From the evidence he found that the land itself had a total value of $12,-700, allowing $7700 for the front portion and $5000 for ten lots in the rear. He found the value of the improvements to be $13,500, making a total of $26,200 for both land and improvements. Then, taking into consideration, as he was permitted, according to the case of Linkswiler v. Hoffman, 109 La. 948, 34 So. 34, 36, “the circumstances by which the vendor [was] surrounded and [giving] weight to the same in determining the value of the property to him at the time he makes the sale”, he fixed a fair value of the whole property in July, 1945 at $22,500. He was of the opinion that the circumstances under which a part *510 of the amount paid as rent was to be applied to the purchase price of $11,100 stipulated in the contract between the parties at the time the lease was entered into had the effect of reducing the actual purchase price to the sum of $7700. At that price, lesion would be present if the value in July, 1945 was held to be as low as $15,-400; so naturally, at the values found by him it was for greater reason found to apply and accordingly he ordered the defendants to deliver title to the plaintiff upon payment of the sum of $22,500 less credits for payments made on the purchase price and various other credits which he found it was entitled to, reducing the payment to be made to the sum of $9,201.07, plus interest at 5% per annum from July 27, 1945, until paid. He reserved to the defendants the right which they had under the contract to redeem the ten lots in the rear of the property at the sum of $500 per lot, for a period of six months following the date upon which this judgment was to become final. From a judgment so decreeing the defendants took a devolutive appeal which the plaintiff has answered.
It is apparent that what the lower court was concerned with and what we are now concerned with on this appeal is a question of fixing the value of property as of a given date several years ago, and in view of the changes in our economic conditions involving the rise in the costs of labor and materials, which were even then growing rapidly, it is a rather difficult matter to be exact in fixing such values and courts must necessarily be guided by the opinions and the testimony of people who are engaged in businesses relating to real estate and the construction of buildings and improvements and more particularly those who are recognized as experts in those fields. The Code prescribes no formula to be followed in fixing, values in cases of lesion and courts are therefore left to the use of their own discretion, (with due observance of the usual rules of evidence, of course) except that in certain instances they may derive some assistance from jurisprudence found in the decisions of cases bearing on the subject.
In this case the learned trial judge seems, to have gone into the matter in a very methodical manner as he considered the intrinsic value of the land and the improvements at first separately, and then as a unit. Afterwards he considered the rental value of the property and finally the circumstances under which the contract for the sale and purchase óf the property was entered into. Not only that, in view of the fact that the rear part of the property had been sub-divided into lots, and apparently the front portion abutting the Airline highway had a greater value, he divided the whole property in two parts seeking appraisals and estimates of the front portion first and then the value of the lots in the rear.
Nine real estate men, all qualified as experts, testified as to the value of the *512 land. The estimate of one of them was so much out of line with that of the other ■eight that his testimony need not be given any consideration.
The front portion of the property measures 140 feet front on the highway and has a depth of 100 feet on one side and 150 feet on the other.' The eight witnesses whose testimony is to be considered, estimated its value at so much per lineal front foot. These estimates range from $35 per foot, which we might state here is considerably lower than any of the other estimates, to $60 per foot. A fair average of all of these estimates, even including the lowest ■of $35 is $55 which is the estimate adopted by the district judge in reaching a value of $7700 for that portion of the property.
The estimates of these same eight expert witnesses regarding the value of the lots in the rear of the property varied in about the same proportion and it was on their estimates that the trial judge placed a value of $500 on each lot, or $5000 for the ten.
Certainly, therefore with regard to the value of the land it is impossible for us to say that the trial judge manifestly erred in the conclusions he reached after considering and analyzing all the testimony he had before him.
There is considerably more difficulty in arriving at the value of the improvements on the property which consisted of a milk processing plant constructed some four years or more before the lessee decided to exercise its option. What made it difficult was, as already indicated, the change in the cost of labor and material, the fact that it was constructed with non-union instead of union labor and also that a good bit of the material used in its construction was second-hand material. Here again, the court is confronted with the opinions of several experts in the field of construction work and it is impossible to satisfactorily reconcile their estimates.
This court long ago recognized, in principle, that the right to have a sale set aside for lesion is the only restriction imposed by law upon the liberty of the citizen to bind himself and his property according to the dictates of his own judgment and consequently the proof to establish lesion should be peculiarly strong and convincing. See Demeret v. Hawkins, 8 La.Ann. 483. In commenting on probable estimates such as were given in that case, the court stated that “they are at best an inferior kind of evidence, admissible only when no better can be had, and they seldom carry conviction to the mind.” It was pointed out that there were thirty-two different witnesses examined and there were as many different estimates made. It is true that in this case there are far from that number but nevertheless there are some whose testimony appears to have impressed the trial judge more than that of the others. They also impress us as having approached the matter on a more scientific and methodical basis in endeavoring to arrive at a fair *514 estimate of the values they placed on the improvements. They are therefore of more assistance to the court in reaching that certainty on which it should act in setting aside a contract entered into between the parties when they were acting in good faith.
One of these witnesses, Mr. J. A. Haase was called by the defendant. He is a general contractor, conducting his business in the City of New Orleans, with an experience of about thirty-five years. He stated that he is called upon three or four times a month, to make appraisements or esti-” mates on the costs of buildings. He fixed the value of the building in this case as of July, 1945 at $18,712.98 less a depreciation from the time of its construction until then of 20%, or, $3742. His estimate of the net value therefore was just a trifle under $15,000, without taking into consideration, as he says, the use of second-hand material in, and the manner of, its construction, which would further reduce its value by 10%.
Mr. John Riess was presented as a witness on behalf of the plaintiff. He has been engaged in the general contracting business for more than forty-five years and has on repeated occasions made estimates of buildings. He fixed the July 1945 value of the building at $11,300 taking into consideration that it was built with secondhand material and non-union labor. With new material and union labor the cost would have been $17,000 and allowing an annual depreciation of 4%, plus a further reduction of 10% for second-hand material and the manner of construction, there would be left a net value of approximately $12,500.
Perhaps the most impressive witness on this point was E. M. Talcott, Assistant Vice-President in charge of the constructional and architectural division of the American Appraisal Company, who was called by plaintiff. The American Appraisal Company is a national organization with headquarters in Milwaukee, Wisconsin. It started business some fifty-four years ago and as stated by the witness, its purpose is to make unbiased appraisals of property for practically every purpose. They have no interest in clients one way or the other and the basis of their pay being on a daily rate, never on a contingent fee, they have no outside influence in establishing a value on a property. In making an appraisal of a building the witness stated that he figuratively tears down the structure and stacks up the various materials used for its construction. He stated that his company keeps charts of material and labor costs in all sections of the country and that he was guided by the charts he had from actual appraisals made in this section from 1940 to 1946. All of this indicates how carefully and systematically this witness went about his work in estimating the value of this building as of July, 1945. With all of the facts before him, as he had accumulated them, he estimated the building as being worth $16,877.63 new and allowing 15% *516 depreciation, he fixed a net value as of July, 1945 of $14,345.99. Making a further allowance for the kind of material used and the manner of construction, we see that his net estimate is very close to that of the estimates made by the two witnesses whose testimony we have just discussed. Taking into consideration all of this as well as all of the other elements involved, we cannot say that the trial judge was wrong in concluding that a fair and sound value of the improvements as of July, 1945 was $13,500.
Among other factors which he gave weight to in determining its value, was the property’s rental value. In this case there were some peculiar circumstances connected with the lease, from which it might be stated that the amount of $150 stipulated in the contract did not represent its real actual rental value. In the first place the contract itself provides the lots in the rear of the property were subject to redemption by the lessor within six months after the lessee would exercise his option to purchase. In the second place, as already shown, in the event the option was exercised, two-thirds of the amount of the monthly rental was to be applied to the purchase price. Thirdly the fact that secondhand material and inferior workmanship was used in the construction of the main building may- have also had some bearing in fixing the amount of the rent at the time of the lease. All of this makes it rather difficult to reconcile the rental of $150 per month with the purchase price of $11,100 stipulated in the option. After taking all of the different elements into consideration, that is, the value of the land and the improvements, which he fixed together as $26,200 and whatever rental value the property had, the trial judge finally concluded that a fair net value of the whole property was $22,500. He properly rejected any al-• lowance for fixtures or equipment in the building because the evidence was convincing that all of these were encumbered with chattel mortgages greatly in excess of their «value and that in order to prevent a sale under foreclosure the plaintiff had to purchase the notes secured by the mortgage for all of which, in addition to the allowance at $100 per month for thirty-four months, it was entitled to credit.
The credits to which he held the plaintiff was entitled were principally on the mortgage indebtedness paid on the equipment in the building, the interest thereon and the amount to be taken out of the rent each month at $100 per month to be applied to part payment of the purchase price. The defendants were found entitled to a credit of $629 for payments made direct to the mortgagee.
 With respect to the credits there does not seem to be any serious dispute unless it be with regard to an item of $1447.60 which was allowed plaintiff as interest paid on the mortgage indebtedness since July 27, 1945. The defendants urged the court erred in this respect because plaintiff should *518 have taken title to the property in July, 1945, at which time payment of the mortgage could have been accelerated by -a payment of a bonus in the sum of $369.10. They contend, therefore, that this latter amount is the only credit plaintiff is entitled to on that item.' However, as title to the property did not pass in July 1945, since a dispute had arisen between the parties it would not be reasonable to have expected that plaintiff would pay off the mortgage until it was assured of getting title and for this reason we think that the trial judge correctly held that the interest paid subsequently to that date was the proper item of credit to allow rather than the bonus of $369.10. All told, the credits allowed in favor of the plaintiff amounted to $19,027.93. The final calculation as made by the trial judge was as follows: The defendants are entitled to (1) the purchase price of the property, $22,500, (2) 34 months rent at $150 or $5100 and (3) a credit of $629 for payments made direct to the mortgagee. This makes a total of $28,229 as against which the total credits of $19,027.93 to which plaintiff is entitled, leaves a balance in favor of the defendants in the sum of $9201.07.
The other matters raised on appeal relate to the respective contentions of the parties with respect to the depreciation on the improvements, but neither side has been able to convince us that the district judge, in the light of all the testimony before him, erred in that respect.
After our careful review of the record and our consideration of the painstaking efforts of the trial judge to arrive at a fair and just valuation of the property on which to apply lesion we are satisfied that justice has been done and can see no reason why the judgment should be disturbed.
For the reasons stated the judgment appealed from is affirmed.
MOISE,'J., recused.

. Since that decision Article 2590 of the LSA-C.C. has heen amended by Act 154 of 1950 which provides that “the immovable must be estimated according to the state in which it was, and the value which it had at the time of the sale, or at the time the option ivas granted if the sale. he made pursuant to a valid contract of option.” The amendment having come into effect after the cause of action arose in this suit and after the suit itself was filed, its provisions are not applicable in this case. (Emphasis supplied)